UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAHIM ALFETLAWI,

        Petitioner,

                             Case No. 15-12149
v.                           Honorable Linda V. Parker

PAUL KLEE,

        Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS

      Petitioner Rahim Alfetlawi ("Petitioner"), confined at the Gus Harrison Correctional Facility in Adrian, Michigan, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, Petitioner challenges his convictions in a Michigan state court for the following: first-degree premeditated murder in violation of Michigan Compiled Laws § 750.316(1)(a); possession of a firearm during the commission of a felony (felony-firearm) in violation of Michigan Compiled Laws § 750.227b; and carrying a firearm with unlawful intent in violation of Michigan Compiled Laws § 750.226. The state trial court sentenced Petitioner to life imprisonment without the possibility of parole for the murder conviction, two years' imprisonment for the felony-firearm conviction,

and two to five years' imprisonment for the other firearm-related conviction. For the reasons stated below, this Court is denying the petition for a writ of habeas.

## I.    Background

A jury convicted Petitioner of the aforementioned offenses following a trial in the Macomb County Circuit Court.

At Petitioner's trial, Dianne Fauer testified that she resided at 24915 Tallman in Warren, between Hoover and Van Dyke off of Ten Mile Road, since the 1970's. (10/12/12 Trial Tr. at 6-8.) Fauer testified that she had a daughter, Wendy Wasinski, and a 19-year-old granddaughter, Jessica Mokdad. (*Id*. at 11; 10/16/12 Trial Tr. at 126.) Jessica's father was Mohammed Mokdad. (10/16/12 Trail Tr. at 124.) In 2000, Wasinski married Petitioner and moved with him first to Tennessee and then to Minnesota. (10/12/12 Trial Tr. at 9-11; 10/16/12 Trial Tr. at 122-123, 130-131.)

In 2008, Jessica began dating a high school classmate named Michael Robertson. (10/16/12 Trial Tr. at 6-9, 140-141). Petitioner found out in December of that year that Jessica and Michael were having sexual intercourse. (*Id.* at 43, 141.) As a result, Petitioner and Wasinski drove Jessica and Robertson 12 hours to Michigan so that Jessica and Robertson could be "married" in a mosque "in the eyes of their religion." (*Id.* at 19, 73, 141.) Jessica and Michael participated in the

ceremony because they "wanted to be with each other," and felt forced by
Petitioner. (*Id.* at 12, 73.)

In 2009 and 2010, Jessica and Michael resided in Coon Rapids in Wasinski
and Petitioner's apartment. (*Id.* at 9-10, 18-19, 142.) Jessica revealed to Michael
that Petitioner had begun repeatedly sexually assaulting her when she turned 18
years old. (*Id.* at 20, 72-73.) The sexual assaults were "[o]ral, vaginal, and anal,"
(*id.* at 20), on nights when Michael was not in the apartment. (*Id.* at 20-21.)
Michael urged Jessica to go to the police. (*Id.*) She refused and urged Michael not
to confront Petitioner directly, fearing that Petitioner would kill Jessica or her
mother. (*Id.* at 22-23.)

Petitioner's apartment was a "small, cramped place with a lot of
[surveillance] cameras." (*Id.* at 13-14, 137-138.) Wasinski testified that all the
cameras were connected to Petitioner's bedroom, (*id.* at 138-139), with a voice-
activated audio recording in Jessica's bedroom. (*Id.* at 139.) Michael testified that
he assumed Petitioner had recording devices throughout the apartment because
Petitioner often seemed to know what Michael and Jessica had been discussing in
private. (*Id.* at 14.)

Michael testified that Petitioner engaged in verbal and physical altercations
with Wasinski and physically assaulted Jessica on several occasions. (*Id.* at 21, 23,
145-146.) Petitioner would "slap" Jessica across the face with an open hand when

"he would get angry." (*Id.* at 21-22.) Michael tried to intervene, imploring Petitioner to "stop." (*Id.* at 22.)

In July 2010, Jessica left her family and returned to Michigan to live with her biological father, Mohammed Mokdad, in Grand Blanc. (*Id.* at 15, 24, 146-147.) Michael remained with Petitioner and Wasinski in Coon Rapids. (*Id.* at 15-16, 148.) In August 2010, Michael relocated to Michigan and resided with Jessica and Jessica's biological father in Grand Blanc. (*Id.* at 15-18, 24, 148.) Petitioner telephoned Michael several times, stating, "I'm gonna fucking kill you!" (*Id.* at 25-26.) Michael testified that he heard similar threats directed at Jessica on her speakerphone. (*Id.* at 26-27.)

Before Christmas 2010, Jessica and Michael moved to Fauer's house on Tallman in Warren. (10/12/12 Trial Tr. at 13-14; 10/16/12 Trial Tr. at 15, 24-25, 30, 154.) Michael worked at a Tim Horton's and Jessica attended school at Macomb County Community College. (10/16/12 Trial Tr. at 31, 84.) Michael testified that he and Jessica continued receiving threatening calls from Petitioner and that Jessica was afraid of Petitioner. (*Id.* at 31-33.)

In late 2010, Petitioner persuaded Wasinski to install spyware on Jessica's cellular telephone during one of Wasinski's visits to Michigan. (*Id.* at 150-155.) When she visited her family for Christmas in 2010, Wasinski installed spyware on Jessica's cellular telephone. (*Id.* at 155-156.) As a result, the spyware listed the

details of Jessica's incoming and outgoing telephone calls and Petitioner could "read her text messages on this website from anybody." (*Id.* at 156.) Petitioner, who was living in Minnesota, "wanted to sit [at his computer] all day and night monitoring [Jessica's] situation." (*Id.* at 157.)

On March 26, 2011, Petitioner and Wasinski came to Michigan at Petitioner's suggestion to visit Wasinski's ailing grandmother. (*Id.* at 34-35, 162-164.) "Everything was calm and normal" and the family had "a typical meet and greet" at the house after visiting Wasinski's grandmother at her nursing home. (*Id.* at 34-35, 165.) Petitioner began pressing Jessica to return to Minnesota. (10/12/12 Trial Tr. at 17-19; 10/16/12 Trial Tr. at 35, 165-166). Jessica responded: "No. I got school and I'm trying to find work, Mike has work, we can't move back." (10/16/12 Trial Tr. at 35.) Petitioner became more aggressive, started yelling, and at one point "smacked" Jessica across the face with an open hand. (10/16/12 Trial Tr. at 36.) He screamed that Jessica "better come home" or she was "gonna have a bad day." (*Id.*) Jessica eventually left Fauer's house with Petitioner and Wasinski, returning with them to Minnesota. (10/12/12 Trial Tr. at 19-21; 10/16/12 Trial Tr. at 38, 93.) Jessica informed Wasinksi and later her friend Chuba that Petitioner had said: "If you don't come with me, I'll kill you." (10/12/12 Trial Tr. at 19; 10/16/12 Trial Tr. at 94-95, 170.)

5

Between March 26, 2011, and April 4, 2011, Petitioner "never wanted to let [Jessica] out of his sight." (10-17-12 Trial Tr. at 9-10.)  Jessica accompanied Wasinski to Wasinski's job and one day told her mother that she could not "live this way" and wanted to "do something with her life." (*Id.* at 11.)  On April 4, 2011, Wasinski agreed to help Jessica "take the train back to Michigan." (10/16/12 Trial Tr. at 39, 98-103; 10/17/12 Trial Tr. at 11.)  Wasinski also told Jessica about the spyware on Jessica's cellular telephone, advising "her [to] get another phone" and periodically talk to friends about unimportant things on the old telephone. (10/17/12 Trial Tr. at 15.)  When Wasinski returned to the apartment, she distracted Petitioner, which allowed Jessica to pack her belongings. (*Id.* at 11-12.) Wasinski told Petitioner she needed Jessica's help at work the next morning, but instead "took [Jessica] straight to the train" station. (*Id.* at 12-14).  Later that day, Wasinski told Petitioner that Jessica "just took off while [Wasinski] was at work." (*Id.*)

On the train, Jessica struck up a conversation with Robert Marlow, who noticed that Jessica was "obviously distraught" as she used her cellular telephone for texting and talking. (*Id.* at  94.)  Jessica told Marlow about the "pattern of abuse, physical, verbal, and . . . mental, emotional abuse at the hands of her step-father." (*Id.* at 95-96.)  Jessica had her clothes in "two garbage bags." (*Id.* at 96-97.) She told Marlow that Petitioner threatened to kill her. (*Id.* at 98-99, 116-117.)

According to Marlow, Jessica "truly believed that [Petitioner] was capable and willing to kill her." (*Id.* at 99, 116-117.)

On April 29, 2011, Wasinski was sitting in her vehicle speaking on her cellular telephone with Jessica, when Jessica said "I need to tell you that [Petitioner] has raped me before." (*Id*. at 17.) Jessica indicated to her mother that she did not tell her because Jessica was "scared" that Petitioner would kill her. (*Id.* at 17.) After this conversation, Wasinski arrived home between 5:00 p.m. and 6:00 p.m. (*Id.* at 18.) As Wasinski cooked dinner, Petitioner left the apartment for a period of 45 minutes. (*Id.*). When he returned, his demeanor had radically changed. (*Id.* at 18-19.) He was "very agitated" and "very nervous." (*Id.* at 19.) Petitioner seemed to be "in a hurry." (*Id.*). He told Wasinski that he wanted to help Fauer "tomorrow over at your grandma's apartment to clean it up." (*Id.*) Wasinski had mentioned this family project a few days earlier but Petitioner had not responded. (*Id.*) Wasinski testified that she was "very tired" and told her husband that she did not want to go. (*Id.*) Wasinski knew Petitioner had placed audio recording devices in her vehicle in the past. (*Id.* at 19-20.) Less than two hours after Wasinski returned home, Petitioner left for Michigan. (*Id.* at 20.)

The following day, April 30, 2011, Fauer was at the seniors' complex where her mother had lived and she was removing items from her mother's apartment. (10/12/12 Trial Tr. at 21-23.) Fauer arrived at 1:00 p.m. and various family

members, including Jessica, assisted her in the move until 3:00 p.m. (*Id.* at 23-25.) At some point, Petitioner appeared at the apartment. (*Id.* at 24.) Fauer was not aware that Petitioner was in Michigan. (*Id.* at 25.) Fauer heard Petitioner tell Jessica that he "wanted to speak with her, maybe get a cup of coffee." (*Id.* at 27.) He said "he wanted to make things right between them." (*Id.*) Jessica then left with Petitioner. (*Id.* at 27-28.) When Fauer left about 30 to 45 minutes later and returned home, she saw Jessica's black Grand Am outside the house. (*Id.* at 28-31.) The house appeared to be empty, however. (*Id.* at 32.) Fauer entered the house, calling Jessica's name. (*Id.* at 33.) When she got to Jessica's bedroom door, Fauer saw Jessica "slumped on the floor, her back against the bedroom door." (*Id.*) Jessica's hair "was strewn across her eye area" and "she was very still." (*Id.*) Fauer reached down to touch Jessica's hand and it felt cold to her. (*Id.*) Jim, another family member who had followed Fauer home, entered the house. (*Id.*). Jim yelled, "Call 9-1-1, she's bleeding from the mouth!" (*Id.*)

Theresa Kerr testified that she was working as a police dispatcher for the Center Line Public Safety Department on April 30, 2011, when Petitioner walked into the lobby at approximately 3:00 p.m. and told her "he had killed his step-daughter." (10/12/12 Trial Tr. at 95-103.) Jessica died of a gunshot to the side of her head, made with a nine-millimeter handgun. (10/12/12 Trial Tr. at 68, 84.)

Petitioner was arrested and subsequently tried and convicted of the above-listed offenses.

Petitioner's convictions were affirmed on appeal. *People v. Alfetlawi*, No. 313855, 2014 WL 4263222 (Mich. Ct. App. Aug. 28, 2014). The Michigan Supreme Court denied Petitioner leave to appeal. *People v. Alfetlawi*, 862 N.W.2d 182 (2015). On June 11, 2015, Petitioner filed the pending habeas petition, seeking relief on the following grounds:

I.  The trial court abused its discretion and deprived defendant of a fair trial and due process of law, as well as his Sixth Amendment right to cross-examination by admitting, over objection, testimony regarding (1) defendant's repeated sexual and general physical assaults upon the decedent and her mother, (2) repeated threats against the physical and emotional well-being of decedent and others, (3) the stalking and surveillance defendant subjected decedent to, (4) the fear and hatred decedent and others had of defendant, and (5) defendant's mental state and obsession with decedent, all of which were irrelevant, inadmissible hearsay, inadmissible as "prior bad acts" under MRE 404(b) and unfair prejudicial.

II. The testimony of a police officer that defendant failed to state that he shot decedent or that it was an accident or call EMS, and the prosecutor's closing argument that defendant's failure to state that he shot the decedent or that it was an accident or to call EMS was evidence of guilt violated defendant's Fifth Amendment right against self- incrimination and denied him a right to a fair trial.

III. Michigan law and the Due Process Clause of the Michigan and United States Constitutions require sufficient evidence to convict a defendant of a criminal

offense. There was insufficient evidence of premeditation required to sustain a conviction for first degree murder, depriving defendant of due process of law.

## II.     Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), as amended, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.' " *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* In order to obtain habeas relief in

federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

## III. Discussion

### A.     Evidentiary Rulings

Petitioner claims he was denied a fair trial by the admission of testimony relating to: (a) his numerous sexual assaults of and threats to the decedent and her mother, (b) his stalking of the decedent, (c) decedent's hatred of Petitioner, and (d) Petitioner's mental state and obsession with the decedent.[1]

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  A federal court is limited in federal habeas review to deciding whether a

---

[1] Respondent contends that portions of Petitioner's first claim are procedurally defaulted.  Procedural default is not a jurisdictional bar to review of a habeas petition the merits. *See Trest v. Cain*, 522 U.S. 87, 89 (1997).  Additionally, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525.  In the present case, application of a procedural bar would not affect the outcome of this case and it is more efficient to proceed directly to the merits.

state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Thus, a federal habeas court usually does not question errors in the application of state law, especially rulings regarding the admissibility of evidence. *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000).

Petitioner first contends that the trial court improperly admitted evidence in violation of the hearsay rule. The admissibility of evidence under Michigan's hearsay rules is not cognizable in a habeas corpus proceeding. *See Byrd v. Tessmer,* 82 F. App'x 147, 150 (6th Cir. 2003) (citing *Estelle*, 502 U.S. at 67-68). Therefore, the admission of this evidence in violation of Michigan's rules of evidence does not entitle Petitioner to relief.

Moreover, the Michigan Court of Appeals reasonably determined that the evidence was properly admitted:

> … among the many record citations provided by defendant are defendant's own statements, relayed by various witnesses at trial, in which defendant threatened them with violence if they did not agree to help him locate and monitor the victim. To the extent that defendant challenges the admissibility of his own statements on hearsay grounds, it is clear that they were admissible nonhearsay under MRE 801(d)(2)(A) (admission of party-opponent offered against the party).
>
> Regarding various statements made by the victim to others, including those in which she disclosed sexual abuse, violence, and threats of violence; expressed her fear for and hatred of defendant; and explained that defendant was monitoring her cellular telephone, the trial court allowed the victim's statements to be admitted under MRE 804(b)(6). MRE 804(b)(6), known as the "forfeiture-by-

wrongdoing rule," *People v. Roscoe*, 303 Mich. App. 633, 640; 846 NW2d 402 (2014), provides that it allows for the admission of an unavailable declarant's hearsay statements when the defendant "engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." As its plain language indicates, MRE 804(b)(6) "incorporate[s] a specific-intent requirement." . . . We therefore conclude that a preponderance of the evidence supports a finding that defendant shot and killed the victim with the specific intent to cause her unavailability to later testify about the alleged sexual abuse once he learned, through the use of his surveillance equipment, that she had disclosed the abuse to her mother. The victim's hearsay statements were therefore admissible under MRE 804(b)(6).

*Alfetlawi*, 2014 WL 4263222, at *4. Petitioner fails to show that the Michigan Court of Appeals' determination that this evidence was admissible under state law was incorrect.

Petitioner's claim that he was denied a fair trial by the admission of irrelevant and highly prejudicial evidence generally cannot form the basis for habeas relief. First, the claim involves a state law evidentiary issue. *See Estelle, supra.* Second, as the Sixth Circuit has observed, "the Supreme Court has never held (except *perhaps* within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012) (emphasis in original) (citing *Dowling v. United States*, 493 U.S. 342, 352-54 (1990) and *Estelle*, 502 U.S. at 67-70).

Petitioner next claims that the state court violated Michigan Rule of Evidence 404(b) by admitting improper character evidence or evidence of his prior bad acts against the victim and her mother. Again, this claim is non-cognizable on habeas review. *See Bey v. Bagley,* 500 F.3d 514, 519 (6th Cir. 2007); *Estelle,* 502 U.S. at 72 (Supreme Court's habeas powers did not permit Court to reverse state court conviction based on its belief that the state trial judge erred in ruling that prior injury evidence was admissible as bad acts evidence under California law); *Dowling*, 493 U.S. at 352-53 (1990)(admission at defendant's bank robbery trial of "similar acts" evidence that he had subsequently been involved in a house burglary for which he had been acquitted did not violate due process). The admission of this "prior bad acts" or "other acts" evidence against Petitioner at his state trial does not entitle him to habeas relief, because there is no clearly established Supreme Court law holding that a state violates a habeas petitioner's due process rights by admitting propensity evidence in the form of "prior bad acts" evidence. *See Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003). Given the lack of Supreme Court holdings on the issue of whether a state court violates a habeas petitioner's due process rights by the admission of evidence to establish the petitioner's propensity to commit criminal acts, the Michigan Court of Appeals' rejection of Petitioner's claim was not an

unreasonable application of clearly established federal law. *See Wright v. Van Patten,* 552 U.S. 120, 126 (2008); *Carey v. Musladin,* 549 U.S. 70, 77 (2006).

An evidentiary ruling may be so egregious that it results in a denial of fundamental fairness and violates the Due Process Clause. *Bugh*, 329 F.3d at 512 (citing *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)). However, "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.' " *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Seymour*, 224 F.3d at 552 (bracket omitted) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). In Petitioner's case, the prejudicial evidence was relevant and admissible under Michigan law. This Court cannot say that under relevant Supreme Court precedent, Petitioner's due process rights were violated by the introduction of this evidence.

Petitioner also alleges that he was denied his confrontation rights when the trial court admitted the decedent's prior statements, ruling that the statements were admissible under Michigan Rule of Evidence 804(b)(6). The Sixth Amendment's Confrontation Clause bars the admission of out-of-court statements that are

testimonial in nature unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36 (2004). Nonetheless, the Confrontation Clause is not implicated, and thus need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U.S. 813, 823-26 (2006); *see also Desai v. Booker,* 538 F.3d 424, 425-26 (6th Cir. 2008). Remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy are not testimonial. *Crawford,* 541 U.S. at 51-52, 56. In holding that the Sixth Amendment right to confrontation does not apply to non-testimonial statements, the Supreme Court stated:

> "The text of the Confrontation Clause reflects this focus on testimonial hearsay. It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

*Davis,* 547 U.S. at 823-24 (brackets omitted) (quoting *Crawford,* 541 U.S. at 51).

Jessica made the admitted statements about Petitioner's physical and sexual abuse to her mother (Wasinski), to her husband (Michael Robertson), to a friend (Kayla Chuba), and to an acquaintance she met on the train from Minnesota to

Michigan (Robert Marlow). (10/16/12 Trial Tr. at 10-23, 72-73, 89-95, 159-60, 170; 10/17/12 Trial Tr. at 95-99, 116-17.)  These out-of-court statements do not qualify as testimonial statements covered by the Confrontation Clause. *See Deshai,* 538 F.3d at 427; *see also Jackson v. Renico,* 179 F. App'x 249, 255 (6th Cir. 2006).  Moreover, because the Confrontation Clause has no applicability to these non-testimonial statements, they were admissible even if they lacked an indicia of reliability. *See Whorton v. Bockting,* 549 U.S. 406, 420 (2007).  In short, the admission of the decedent's out-of-court statements did not violate Petitioner's right to confrontation.

For the above reasons, Petitioner's claims pertaining to the trial court's evidentiary rulings are without merit.

## B.  Self-incrimination

Petitioner alleges that his Fifth Amendment right against self-incrimination and his right to a fair trial were violated when police officer Kerr testified that Petitioner never stated that he accidently shot the decedent or called EMS and when the prosecutor stated during closing argument that Petitioner failed to claim that he accidently shot the decedent or called EMS.  Respondent contends that this claim is procedurally defaulted because Petitioner failed to object to the alleged error during trial. The Michigan Court of Appeals agreed and reviewed this claim

for plain error, but also addressed the merits of the claim. *Alfetlawi*, 2014 WL 4263222, at *8.

In *Fleming v. Metrish,* 556 F.3d 520, 532 (6th Cir. 2009), a panel of the Sixth Circuit held that AEDPA deference applies to any underlying plain-error analysis of a procedurally defaulted claim.  In a subsequent decision, the Sixth Circuit held that plain-error review is not equivalent to adjudication on the merits, so as to trigger AEDPA deference. *See Frazier v. Jenkins*, 770 F.3d 485, 496 n. 5 (6th Cir. 2014).  The Sixth Circuit subsequently recognized that "the approaches of *Fleming* and *Frazier* are in direct conflict." *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015).  When confronted by conflicting holdings of the Sixth Circuit, this Court must follow the earlier panel's holding until it is overruled by the United States Supreme Court or by the Sixth Circuit sitting *en banc*. *See Darrah v. City of Oak Park,* 255 F.3d 301, 310 (6th Cir. 2001).  This Court believes that the AEDPA's deferential standard of review applies to these claims, even though they were reviewed for plain error.

The Supreme Court has held that prosecutors may use a defendant's pre-arrest silence as substantive evidence of his guilt provided the defendant did not expressly invoke his right to remain silent. *Salinas v. Texas*, 133 S. Ct. 2174, 2179, 2184 (2013); *see also Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014). Kerr testified that Petitioner entered the police station at approximately 3:00 p.m.

19

on April 30, 2011, stating that he had "killed his step-daughter." (10/12/12 Trial

Tr. at 99-100.) Kerr further testified that Petitioner then provided his Minnesota

driver's license and a note saying he was a victim of torture and was under

psychiatric care. (*Id.* at 100-101.)

The Michigan Court of Appeals reasonably found that Petitioner was not yet

arrested or *Mirandized* for Jessica's murder "because he was not under arrest and

had not been read his *Miranda* rights when he made the voluntary statements to

the dispatcher, nor could his silence otherwise be attributable to the invocation of

his Fifth Amendment rights." *Alfetlawi*, 2014 WL 4263222, at *8.  When viewed

in context, the prosecutor's comments referred to Petitioner's "silence" before he

was arrested or invoked his right to remain silent and were thus permissible.

Therefore, Petitioner is not entitled to relief on his second claim.

### C.    Sufficiency of the Evidence

Petitioner alleges that there was insufficient evidence of premeditation to

sustain his first-degree murder conviction.

It is beyond question that "the Due Process Clause protects the accused

against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged." *In re Winship,* 397

U.S. 358, 364 (1970).  The critical inquiry on review of a sufficiency of the

evidence claim is "whether the record evidence could reasonably support a finding

of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318

(1979).  The court does not "ask itself whether *it* believes that the evidence at the

trial established guilt beyond a reasonable doubt."  *Id*. at 318-19 (emphasis in

original).  "Instead, the relevant question is whether, after viewing the evidence in

the light most favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Id.*

(emphasis in the original).

A federal habeas court may not overturn a state court decision that rejects a

sufficiency of the evidence claim simply because the federal court disagrees with

the state court's resolution of that claim.  A federal court may grant habeas relief

only if the state court decision was an objectively unreasonable application of the

*Jackson* standard. *See Cavazos v. Smith,* 132 S. Ct. 2, 4 (2011).  "Because rational

people can sometimes disagree, the inevitable consequence of this settled law is

that judges will sometimes encounter convictions that they believe to be mistaken,

but that they must nonetheless uphold." *Id.*  For a federal habeas court reviewing

the sufficiency of evidence for a state court conviction, "the only question under

*Jackson* is whether that finding was so insupportable as to fall below the threshold

of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

On habeas review, a federal court does not re-weigh the evidence or re-

assess the credibility of the witnesses whose demeanor was observed at trial.

*Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the fact-finder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

To convict a defendant of first-degree murder under Michigan law, the state must establish that a defendant's intentional killing of another was deliberate and premeditated. *See Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002) (citing *People v. Schollaert*, 486 N.W.2d 312, 318 (1992)). The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001) (citing *People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995)); *see also DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998). The Sixth Circuit, citing Michigan law, has provided a non-exhaustive list of factors relevant to assessing premeditation: (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide. *Cyars v. Hofbauer*, 383 F.3d 485, 491 (6th Cir. 2004) (citing *Anderson*, 531 N.W.2d at 786). Premeditation and deliberation may be inferred also from the type of weapon used and the location of the wounds inflicted. *See People v. Berry*, 497 N.W.2d 202, 204 (Mich. Ct. App. 1993). Use of a lethal

weapon will support an inference of an intent to kill. *Johnson*, 159 F. Supp. 2d at 596 (citing *People v. Turner*, 233 N.W.2d 617, 619 (Mich. Ct. App. 1975)).

The Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence claim, providing a lengthy recitation of the circumstances supporting the jury's verdict. *See Alfetlawi,* 2014 WL 4263222, *2-3. The Michigan Court of Appeals found "ample evidence from which a reasonable jury could find, beyond a reasonable doubt, that defendant intentionally killed the victim and that the killing was premeditated and deliberate." *Id*. at *3. This was not an objectively unreasonable application of the *Jackson* standard. There was sufficient evidence of premeditation and deliberation to support Petitioner's first-degree murder conviction, including Petitioner's tumultuous relationship with the victim, Petitioner's previous threats to kill her, his use of a gun to shoot her in the head, and the fact that he did not seek medical help despite claiming that the shooting was accidental. As such, reversal is unwarranted.

## IV.   Conclusion

For the reasons set forth above, the Court finds no merit to the grounds Petitioner raises in support of his request for habeas relief. The Court therefore is denying the petition for a writ of habeas corpus. The Court is denying Petitioner a certificate of appealability.

In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Petitioner fails to make a substantial showing of the denial of a federal constitutional right. His claims concerning the admissibility of evidence are not cognizable on habeas review and the admission of the evidence did not deny Petitioner a fundamentally fair trial. Petitioner's confrontation clause claim fails because the statements at issue were not testimonial. Finally, there was sufficient evidence to support Petitioner's first-degree murder conviction.

The Court also is denying Petitioner leave to appeal *in forma pauperis* because the appeal would not be taken in good faith. 28 U.S.C. § 1915(a)(3).

Accordingly,

**IT IS ORDERED** that the Petition for a Writ of Habeas Corpus is **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability and leave to appeal *in forma pauperis* are **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: November 1, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, November 1, 2017, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager